763 F.2d 354
 119 L.R.R.M. (BNA) 2848, 103 Lab.Cas. P 11,520
 Richard L. SMEGAL, Marvin A. Rogers, and Rodney W. Bomstad,
on behalf of themselves and all others similarly
situated, Appellants,
v.
GATEWAY FOODS OF MINNEAPOLIS, INC., National Super Markets,
Inc., and Over-the-Road, City Transfer, Cold Storage,
Grocery & Market Drivers, Helpers & Inside Employees Union,
Local No. 544, affiliated with the International Brotherhood
of Teamsters, Chauffeurs, Warehousemen and Helpers of
America, Appellees.
 No. 83-2489.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 11, 1984.
Decided June 5, 1985.
 
 James C. O'Neill, St. Paul, Minn., for appellants.
 David R. Hols, Erwin A. Peterson, St. Paul, Minn., and Frank Vogl, Minneapolis, Minn., for appellees.
 Before MC MILLIAN, Circuit Judge, FAIRCHILD*, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.
 FAIRCHILD, Senior Circuit Judge.
 
 
 1
 Plaintiffs' principal claim is for breach of a collective bargaining agreement under Sec. 301(a) of the Labor Management Relations Act (LMRA) (29 U.S.C. Sec. 185). Plaintiffs are three drivers and warehousemen formerly employed at the Hopkins, Minnesota food distribution facility of National Super Markets, Inc. (National). Plaintiffs stated that they sued on behalf of others similarly situated although no class has been certified.
 
 
 2
 Before July 6, 1981, National operated the Hopkins facility to distribute food products to a number of National's retail stores. On that date National turned the Hopkins operation over to Gateway Foods of Minneapolis, Inc. (Gateway). Gateway began to operate the Hopkins facility. It had previously operated and continued to operate its own Marshall Street Warehouse. Plaintiffs continued to work at Hopkins for a time. Ultimately all National/Hopkins employees were displaced. Defendants are National, Gateway, and a Union, Local No. 544, Teamsters, which had similar collective bargaining agreements with both National and Gateway. Plaintiffs were treated by Gateway as new hires except for certain terms negotiated for them by the Union. They suffered loss of seniority (and ultimately loss of jobs), wages and other benefits as a result of the transfer. They allege that the Union breached its duty of fair representation.
 
 
 3
 Plaintiffs' principal claim against Gateway is that Gateway became the successor to National as to the distribution operation, and became bound by the Union's collective bargaining agreement with National. The agreement provided that it is binding on successors. If Gateway were bound to perform National's agreement, plaintiffs had continuing seniority and other rights as if they had continued in National's employ. They would be entitled to substantial relief from Gateway.
 
 
 4
 National and Gateway, however, took the position that the transfer of the distribution function amounted to subcontracting, and the National agreement provided less favorable rights in that event. The Union treated the change as subcontracting, and made a supplemental agreement with Gateway covering the arrival of the National/Hopkins employees on the Gateway payroll. The supplemental agreement provided somewhat more favorable terms than plaintiffs could have insisted upon in the event of subcontracting, but substantially less favorable than would have been due under a successorship theory. Later when plaintiff Smegal presented a grievance based on the successorship theory, and Gateway rejected it, the Union declined to invoke further steps in the grievance procedure.
 
 
 5
 The district court granted summary judgment for defendants. Because the collective bargaining agreements provided for arbitration remedies which had not been utilized, the critical question was whether there was an issue of fact as to Union breach of its duty of fair representation in failing to advocate the successorship theory. Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). There is no serious claim that the Union action was discriminatory or taken in bad faith in any malevolent sense. The court concluded that the facts would not support a finding that the Union conduct was arbitrary.
 
 I. FACTS
 
 6
 On June 23, 1981, National and Gateway executed several agreements to accomplish the transfer to Gateway of National's operation of distributing merchandise to National's retail stores. The terms of these agreements were not made known to plaintiffs or the Union until much later. Plaintiffs now contend that the transfer pursuant to these agreements constituted Gateway as National's successor within the meaning of National's collective bargaining agreement.
 
 
 7
 In essence National subleased most of its Hopkins facility to Gateway and sold Gateway its warehouse inventory, fixtures and equipment. In a "service agreement," Gateway agreed to sell and distribute merchandise to 62 National retail stores. Gateway agreed to employ former National/Hopkins employees as needed to perform National's business. The arrangement was for five years, terminable by either party with one year's notice. One could infer a degree of uneasiness about the effect on rights of employees because the service agreement required National to indemnify Gateway against claims of adversely affected employees, and there was another separate agreement making the arrangement contingent upon Gateway's reaching a satisfactory agreement with the Union within 15 days. Satisfactory agreement was defined, in part, as one in which National employees would be hired by Gateway, as needed, in accordance with their National seniority, but as new Gateway employees with no seniority at Gateway.
 
 
 8
 On June 24, representatives of National met with an executive of the Union and informed him that Gateway would take over the warehousing and transportation operation under the subcontracting provisions of the collective bargaining agreement. The subcontracting provisions of National's agreement with the Union required as a condition of any subcontract, "the employment in accordance with their seniority of such employees as the contracting employer requires to perform such work or services." The Union relied upon National's characterization of the National/Gateway transaction. It never requested to see and did not see the National/Gateway agreements.
 
 
 9
 On June 28, officials from the Union met with plaintiffs. They told plaintiffs that they did not know the details of the National/Gateway transaction, but they would find out in a forthcoming meeting with Gateway representatives. One Union official noted the subcontracting provisions of the master agreement applied and that the three major problems were "dovetailing, vacations, layoffs and rate of pay." Plaintiffs passed a motion directing the Union to pursue all legal steps to stop the Gateway acquisition. The Union refused to accept a motion that one of the National stewards accompany Union officials to the meeting with Gateway. The Union contended that Gateway had no obligation to let National's stewards sit in on the negotiation meetings because they were not Gateway employees. This view of their status was consistent with the proposition that the Union was acting as collective bargaining representative for the Gateway unit.
 
 
 10
 On June 29, the Union had a meeting with Gateway and National representatives. The Union sought in addition to other things treatment of plaintiffs as ongoing, not new, employees. Gateway was not agreeable to that suggestion. The meeting ended without the parties coming to any type of agreement.
 
 
 11
 The same parties met again on July 1. After three or four hours the parties came to an agreement. Later that agreement (hereafter referred to as the "transition agreement") was reduced to writing. The transition agreement provided that: (1) Gateway would hire National employees, as needed, according to National's seniority list; (2) the ex-National employees hired by Gateway would be considered new at Gateway but without a probationary period; (3) the ex-National employees would start at 80% of the base wage rate and receive a 5% increase every 45 days (instead of 75% of the base wage and 5% increases every 90 days); (4) there would be no lapse in health or pension benefits; (5) vacations accrued and scheduled would be honored with National paying for them (accrual of vacation rights as new employees of Gateway commenced as of July 6, 1981); (6) all ex-National employees were endtailed behind any Gateway employees hired on or before July 5, 1981; and (7) there was a six-month moratorium on job-bidding by Gateway employees for positions at National's Hopkins warehouse.
 
 
 12
 On July 5, plaintiffs met with the Union. The Union distributed pension retirement information and an unsigned copy of the transition agreement. Plaintiffs were informed that the Union's attorney had advised it against fighting the acquisition. Plaintiffs inquired whether they had a vote on the transition agreement. They were informed that they did not have a vote or a voice in it. The Union contended that plaintiffs were not entitled to a vote for two reasons. First, when the agreement was executed, July 5, they were not employed by Gateway. They did not become Gateway employees until July 6. Second, when a collective bargaining agreement creates a benefit for members or increases the terms or conditions of employment, members do not have a vote. The Union contends that the modification was beneficial to National employees because they did not have to undergo a probationary period, the normal progression in pay rates for new hires was accelerated, and there was a moratorium on job-bidding by Gateway employees for six months.
 
 
 13
 There was evidence that Gateway hired 113 out of a possible 127 National employees, that operations at the Hopkins facility continued at least for a time with the same supervisors, and served substantially the same stores.
 
 
 14
 In August 1981, plaintiff Smegal filed Grievance No. 2707. It appears to be the first expression of the theory that Gateway was a successor to National and was therefore obligated to plaintiffs under National's collective bargaining agreement. It clearly relied on Gateway's obligation as a successor under National's agreement, and claimed that the " 'endtailing' of former [National] employees and treating them as 'new' employees of Gateway, employable at reduced wage rates, without ratification by the affected employees of said July 1981 Agreement between Gateway and Local No. 544, violates the rights which grievant, and all other employees similarly situated, enjoyed under the above-mentioned Master Contract and Addenda Agreement, the terms and provisions of which are binding upon Gateway."
 
 
 15
 The Union sent the grievance to Gateway which rejected it. The letter of Gateway's counsel wholly ignored the claim of successorship, and the fact that the grievance asserted a violation of the agreement between National and the Union, allegedly binding upon Gateway because of successorship. Counsel wrote: "Although the enclosure purports to be a grievance, it does not contain any claim that Gateway has, in any way, violated a contract with your labor organization." That the theory of the grievance was deliberately ignored is emphasized by counsel's later deposition testimony that he had recognized uncertainties in the successors and assigns clause. He said it was his opinion that Gateway was not legally a successor, but also, "Whether we are or are not a successor is a factual question to be determined by all the circumstances of the takeover."
 
 
 16
 The Union sent Smegal a copy of Gateway counsel's non-answer, but gave no explanation of its own position, although requested to do so.
 
 
 17
 In November 1981, plaintiffs filed a charge against the Union with the National Labor Relations Board (NLRB). Plaintiffs alleged that the Union had negotiated and implemented an agreement providing for lower wages or seniority for certain employees and had refused to process a grievance relative thereto. The NLRB Regional Director dismissed the charge, saying:
 
 
 18
 [T]he investigation failed to establish that the Employer or Union entered into or thereafter implemented their July 6, 1981, agreement because of unlawful motives or considerations, rather than, as contended by the Employer and the Union, that they negotiated in good faith and reached a valid and mutually satisfactory agreement based on lawful, economic considerations. Further, the evidence failed to establish that the Employer or Union refused to process the grievance for reasons other than their good faith belief that they had acted in a manner consistent with their obligations under their agreement.
 
 
 19
 In August 1981, the Union filed an unfair labor practice charge against National alleging a violation of Sec. 8(a)(5). The Union claimed that National had refused to bargain in good faith with the Union regarding severance pay. The charge was dismissed by the Regional Director of the NLRB. The Union filed an appeal with the NLRB Office of the General Counsel in Washington, DC. The appeal was denied.
 
 
 20
 Plaintiffs' complaint in this action alleged (1) that Gateway was in breach of a collective bargaining agreement, that it was a successor to National and was bound by the terms of National's agreement with the Union; (2) alternatively that National had breached its collective bargaining agreement with the Union by refusing to negotiate the severance pay claim of National/Hopkins employees;[1] (3) that the Union had breached its implied statutory duty of fair representation; and (4) that the Union had violated plaintiffs' "equal rights" under Sec. 101(a)(1) of the Labor Management Reporting and Disclosure Act of 1959 (LMRPA) (29 U.S.C. Sec. 411(a)(1)).
 
 
 21
 Following discovery all three defendants (Gateway, National and the Union) moved for summary judgment. The district court, after finding that "no conflict between the plaintiffs' recitation of the facts and the defendants' description of events" existed, granted summary judgment for the defendants. Specifically the district court held that: (1) the Union's conduct was not "so arbitrary as to be a breach of the duty to fairly represent plaintiffs"; (2) since there was no breach of the duty to fairly represent plaintiffs by the Union, all claims against Gateway and National must be dismissed; and (3) plaintiffs' LMRDA claim was inapt because they were National employees and had no union-constitutional right to ratify a modification of the Union-Gateway collective bargaining agreement. The district court did not address the Union's failure to proceed with the Smegal grievance based on successorship.
 
 II. DUTY OF FAIR REPRESENTATION
 
 22
 Summary judgment may only be awarded if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. F.R.Civ.P. 56.
 
 
 23
 For employees to maintain a suit against their employer under 301(a) of the Labor Management Relations Act they must exhaust any exclusive grievance and arbitration procedures established under the collective bargaining agreement. Hines v. Anchor Motor Freight, 424 U.S. 554, 566, 96 S.Ct. 1048, 1057, 47 L.Ed.2d 231 (1976); Vaca v. Sipes, 386 U.S. 171, 186, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967); Sanders v. Youthcraft Coats, Etc., 700 F.2d 1226, 1231 (8th Cir.1983); Warren v. International Broth. of Teamsters, Etc., 544 F.2d 334, 337-38 (8th Cir.1976). Only if exhaustion has been precluded by the Union in breach of its duty of fair representation can this obligation be bypassed. Vaca, 386 U.S. at 186, 87 S.Ct. at 914. Neither party contends that remedies were exhausted under the National-Union (or even the Gateway-Union) agreement.
 
 
 24
 Therefore the issue before this court is whether any reasonable view of the facts would establish that the Union breached its duty of fair representation. A breach of the statutory duty of fair representation occurs when a union's conduct is arbitrary, discriminatory, or in bad faith. Id. at 190, 87 S.Ct. at 916; Brown v. Trans World Airlines, 746 F.2d 1354, 1357 (8th Cir.1984). Plaintiffs claim there is at least an issue of fact whether the Union's conduct was arbitrary. A union's conduct may be arbitrary even though it acted in good faith and without any hostile motive. Smith v. Hussmann Refrigerator Co., 619 F.2d 1229, 1237 (8th Cir.) (en banc), cert. denied, 449 U.S. 839, 101 S.Ct. 116, 66 L.Ed.2d 46 (1980).
 
 
 25
 We think this case requires analysis at two stages. The first is approximately July 6, 1981, when the operations were transferred. Up to then the Union had accepted the employers' representation that subcontracting was involved. It had not attempted to examine the contracts between National and Gateway. It was not aware of the leverage it could exert by refusing to make a "satisfactory" agreement with Gateway. Although it had negotiated certain favorable terms for former National employees when hired by Gateway, the Union had pretty clearly worn its Gateway hat while negotiating. It refused to permit National employees to participate in the bargaining process. This was all consistent with acceptance of the subcontracting theory.
 
 
 26
 The second stage was the Union's refusal to process Smegal's successorship grievance. Doing so would have required it to wear its hat as a collective bargaining representative of National employees.
 
 
 27
 The first stage was carefully considered by the district court, and we agree with the conclusion reached. The proof as of that stage shows failure to investigate the transaction and failure to perceive a legal theory. "Mere negligence, poor judgment or ineptitude are insufficient to establish a breach of the duty of fair representation." N.L.R.B. v. Am. Postal Wkrs. Union, Etc., 618 F.2d 1249, 1255 (8th Cir.1980). If there were no second stage, summary judgment for defendants would have been appropriate.
 
 
 28
 The district court did not focus on the second stage, however, and we conclude that when it is considered, there must be a different result. Smegal's grievance was clearly stated and surely meritorious if successorship were established. The Union had a duty at least to consider it in its capacity as a collective bargaining representative for National employees under the National agreement. We do not think it escaped that duty by reason of the supplemental agreement it had made with Gateway as a representative of Gateway employees, nor by making claims against National for severance pay. The Union, however, did no more than to pass on to Smegal the non-answer given by Gateway. It offered no comment nor reason of its own why it considered further action inappropriate. It is difficult to suggest a sound reason, particularly when there is evidence that the Union's chief executive officer had previously told Smegal he would "back" the successorship claim. There is evidence that after return of the grievance Smegal pressed the Union for explanation or action.
 
 
 29
 Smegal did not have an absolute right to have his grievance taken to arbitration, but "a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion." Vaca v. Sipes, 386 U.S. at 191, 87 S.Ct. at 917. Evidence that the Union acted without concern or solicitude, or gave a claim only cursory attention will support a claim that the Union acted in a perfunctory manner. Curtis v. United Transp. Union, 700 F.2d 457, 458 (8th Cir.1983).
 
 
 30
 We conclude that the evidence would support a jury finding that the Union's treatment of Smegal's successorship grievance was perfunctory, and therefore arbitrary. We by no means decide that Gateway was a successor, but it cannot be said as a matter of law that it was not.
 
 
 31
 Accordingly, the judgment on the contract claim based on alleged successorship must be reversed.
 
 III. LMRDA CLAIM
 
 32
 Plaintiffs contend that the court erred in dismissing their claim under LMRDA Sec. 101(a)(1) (29 U.S.C. Sec. 411(a)(1)). This section grants every union member a right to vote on agreements if granted under the organization's constitution and bylaws. A denial of the right to vote, when it is required by the union's constitution, is a violation of Sec. 101(a)(1). Christopher v. Safeway Stores, Inc., 644 F.2d 467, 470 (5th Cir.1981); Deboles v. Trans World Airlines, Inc., 552 F.2d 1005, 1018 (3rd Cir.), cert. denied, 434 U.S. 837, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977); Confederated Independent U. v. Rockwell-Standard Co., 465 F.2d 1137, 1140 (3rd Cir.1972). The Union contends that plaintiffs were not entitled to a vote because the transition agreement was a modification of the Gateway-Union contract and they were not yet employees of Gateway (they became Gateway employees on July 6, 1981, one day later). In addition, the Union contends no ratification vote is utilized in collective bargaining agreement modifications if the terms of the new agreement are more favorable than those of the prior agreement. Plaintiffs did receive a benefit from the modification of the Gateway-Union agreement if only subcontracting was involved.
 
 
 33
 Assuming that Gateway was not National's successor, and that the Union was negotiating on behalf of Gateway employees, it was rational for the Union to conclude that plaintiffs had no voice in or vote on the modification. The constitution and bylaws of Local 544, Section 26, Negotiations, Ratification of Agreements, Strikes and Lockouts, provides that:
 
 
 34
 C. Ratification of agreements or amendments shall be subject to vote in the same manner as provided for in connection with bargaining demands as set forth in Section A above....
 
 Section A provides that:
 
 35
 A. Whenever a collective bargaining agreement is about to be negotiated, modified ... the President shall call a meeting at which the membership shall determine and authorize the bargaining demands to be made. The Local Union Executive Board shall determine whether such meeting shall be limited to the members in a particular division, craft or place of employment.
 
 
 36
 It is evident from the constitution and bylaws that someone was entitled to a vote on the modification. But the Union could have limited the vote to Gateway employees as of July 5, thereby eliminating all National employees. The fact that plaintiffs were affected by the modification as future employees of Gateway does not entitle them to a vote. Therefore we hold that the claimed violation was not established.
 
 
 37
 Insofar as the judgment and order appealed from dismissed the contract claim based on successorship, they are reversed and the cause remanded for further proceedings consistent with this opinion, including determination whether this action is to be maintained as a class action. In all other respects they are affirmed. Each party shall bear own costs of appeal.
 
 
 
 *
 Honorable Thomas E. Fairchild, Senior Circuit Judge of the United States Court of Appeals for the Seventh Circuit, sitting by designation
 
 
 [1]
 Plaintiffs later sought to amend their complaint to add a new count against National. The new count makes a claim of fraud upon ten bakery employees. The alleged fraud arose as follows: National's service agreement with Gateway provided that "National will retain the responsibility of operating the bakery." There was an option for National to pass on to Gateway the responsibility for operating the bakery. National never exercised the option and continued to operate the bakery after the National/Gateway transaction. Since National continued to operate the bakery it was obligated to pay bakery employees' wages according to the National-Union agreement. But the ten bakery employees were treated as if they were new Gateway employees. Since the bakery employees turned in their timecards to Gateway and received their checks from Gateway they were unaware that they were still National employees. Plaintiffs learned this during discovery. Plaintiffs claim in this regard must fail. To maintain an action against one's employer under Sec. 301(a), a union member must exhaust contractual remedies. There is no evidence of a greivance on this claim or any breach of Union duty
 Moreover, named plaintiffs lack standing.
 The named plaintiffs and the bakery workers have different claims. Plaintiffs suffered no injury from anything which happened to the bakery workers.