Selman (Joe) THOMAS, Jr.; Lloyd Anderson; David Bell; Dale John Burk; Dennis Canterbury; John Conner; Curtis Cotton; Michael DeJaynes; Bessie Estell; Mary Louis Fillbach; Paul Flower; David Foster; Donald Froien; James George; Eddie Gill; Ivan Heesacker; Robert Hinsely; Lewis Huston; Josephine James; Calvin Jewett; Ralph Johnson; Kent Jorgensen; Patricia Livengood; William Marsh; Clyde Moore; Percy Moore; James Nash; Robert Peters; John Pittman; Sylvio Rebolloso; Jane Reed; Wayne Shaffar; Paul Stone; James Thompson; James Walker; Clayton Welch; Ishanwee Wrenn; Gerald Carew; Thomas Hayden; and Melvin Wade, Jr., Appellants,

v.

BAKERY, CONFECTIONERY AND TOBACCO WORKERS UNION LOCAL #433 and Metz Baking Company, Appellees.

No. 86–2214.

United States Court of Appeals, Eighth Circuit.

Submitted May 15, 1987.

Decided Aug. 17, 1987.

Rehearing and Rehearing En Banc Denied Sept. 24, 1987.

Thomas J. Young, Omaha, Neb., for appellants.

MacDonald Smith, Sioux City, Iowa, for Bakery, Confectionery and Tobacco Workers Union Local No. 433.

Joe P. Cashen, Omaha, Neb., for Metz Baking Co.

Before ARNOLD, Circuit Judge, WRIGHT* and HENLEY, Senior Circuit Judges.

* The Hon. Eugene A. Wright, Senior United States Circuit Judge for the Ninth Circuit, sitting by designation.

ARNOLD, Circuit Judge.

In this action, plaintiffs are former employees of Interstate Brands Corporation ("IBC"), a bakery. In February 1983, defendant Metz Baking Company, a competitor of IBC, bought most of IBC's assets, including the plant on Leavenworth Street in Omaha, Nebraska, where plaintiffs worked. After the sale, Metz employed plaintiffs at the Leavenworth bakery for two weeks, until it closed down the other bakery it operated in Omaha, on Nicholas Street, and transferred the Nicholas Street employees (who were represented by the same union that represented the former IBC employees, defendant Local No. 433 of the Bakery, Confectionery, and Tobacco Workers Union) to the Leavenworth plant. Metz then "end-tailed" the former IBC employees, which means it placed them at the bottom of the plantwide seniority list, after most of the Nicholas Street employees, for purposes of lay-offs. Of course, since Metz had two full complements of employees assigned to the Leavenworth plant after the transfers, lay-offs were immediately necessary, and the plaintiffs were laid off.

After unsuccessfully taking their lay-offs to arbitration, plaintiffs sued the Union for violating its duty of fair representation and Metz for breaking the collective-bargaining agreement it had with plaintiffs. The trial was bifurcated. The question of liability was first submitted to the jury on special interrogatories, with the idea that relief would be determined at a later stage of the case if the jury should find defendants liable. The jury did find in favor of plaintiffs, but the District Court granted judgment n.o.v. for defendants and, in the alternative, denied defendants' motion for a new trial. Plaintiffs appeal the judgment n.o.v., and defendants claim error in the denial of their alternative motion for a new trial. We hold that the District Court erred in granting judgment n.o.v. but was correct in denying the new trial; therefore we direct that judgment be

entered on the jury's verdict, and remand for determination of appropriate remedies.

## I.

The Union represented both groups of employees involved here, as well as other bakery workers, and it had negotiated a single collective-bargaining agreement, on behalf of all its members, with IBC, Metz, and another baking company. But although there was only one written contract, the words of that contract represented separate labor agreements running between each employer and the individual bargaining units of that employer's workers. And each separate plant comprised an independent bargaining unit. Thus, before Metz bought IBC's assets, there was one agreement governing labor relations between IBC and its Leavenworth employees, and another between Metz and its Nicholas employees, and the terms of the two agreements were identical.

The labor agreement, in effect from May 2, 1982, until May 5, 1985, provided in part:

### ARTICLE X

### SENIORITY

\* \* \* \* \* \*

Section 4. In the event it becomes necessary to reduce the working force for the lack of business or other legitimate reasons, the last person hired in the plant shall be the first person laid off. . . .

P.Ex. 2, at 3–4. The agreement also stated: "This Agreement and the provisions herein contained shall be binding upon the parties hereto, their heirs, successors or assigns." *Id.* at 18.

In February 1983, when Metz agreed to buy IBC's assets, Metz and IBC recorded their agreement in a lengthy purchase contract. Among the assets that IBC agreed to transfer to Metz were:

[Section 1.1] (c) All of the rights of [IBC] in, to and under the contracts and commitments described in Exhibit D hereto; provided, however, that such contracts and commitments shall be assigned to [Metz] subject to all of the terms thereof. . . .

P.Ex. 1, at 2. Exhibit D to the purchase agreement described the collective-bargaining agreement between IBC and its Leavenworth employees. In turn, Metz agreed to

[Section 3.1] (c) the assumption by [Metz] of the liabilities and obligations of [IBC] under the realty leases, contracts and commitments referred to in Sections 1.1 (b) and (c) hereof.

*Id.* at 5. Metz and IBC also agreed that payment of the purchase price would be made in part

[Section 3.2] (b) by the delivery to [IBC] of a written undertaking ... whereby [Metz] agrees to assume, pay, perform, satisfy and discharge the unfulfilled portion ... of any and all duties, obligations and liabilities of [IBC] under the realty leases, contracts and commitments identified in Exhibits C and D hereto[.]

*Ibid.*

In addition to these provisions regarding the rights and duties that Metz would assume from IBC, the purchase agreement also provided for the "transfer" of employees from IBC to Metz.

*Section 10. Transferred Employees.*

10.1 All of Seller's employees who are primarily engaged in the conduct of the Subject Operations as of the Transfer Date shall become employees of Buyer on the Transfer Date (the "Transferred Employees"), and Buyer shall become the successor employer under, and shall use its best efforts to obtain novations with respect to, each of the collective bargaining agreements identified in Exhibit D hereto. Seller agrees to make full and final settlement with the Transferred Employees, as of the Transfer Date, with respect to wages, salaries, union dues, contributions to welfare and employee benefit plans, payroll taxes, premium pay and all other obligations relating to their employment by Seller, to and including the Transfer Date, except for the accrued vacation rights, if any, of the Transferred Employees, which rights Buyer agrees to recognize and honor

subsequent to the Transfer Date, and except for contingent work week credits not yet due and payable.

\* \* \* \* \* \*

10.3 Notwithstanding the foregoing, in the event that any claim is made against Seller, by reason of Seller having been a party to any of the collective bargaining agreements identified in Exhibit D hereto, or for severance or termination pay under or pursuant to any of said agreements by reason of the transfer of any employees to Buyer, the termination of any of the Transferred Employees by Buyer or the termination of any employees by Seller at the request of Buyer, Buyer shall indemnify and save Seller harmless from and against all such claims, including all costs and expenses of defending against any such claims and any and all liabilities arising therefrom. Nothing contained herein shall be deemed or construed to require Buyer to continue to employ any of the Transferred Employees during any period following the Transfer Date.

*Id.* at 13–14.

When Metz closed the purchase on February 19, 1983, it took on the former IBC employees and treated them as "new hires" as of that date, which destroyed their previous seniority with IBC and made them junior to all of Metz's Nicholas Street employees who had been hired before then. Plaintiffs' claim against Metz rests on the effect of the purchase agreement: If Metz agreed to assume IBC's duties under the IBC–Leavenworth Street labor contract, then Metz was obliged to recognize the seniority plaintiffs had with IBC, and Metz could not treat them as new hires in February 1983, nor end-tail them to the Nicholas Street workers.

But plaintiffs have already presented this claim in arbitration, and the arbitrator ruled against them. This presents an obstacle to review of plaintiffs' claim in federal court, for plaintiffs are party to a labor contract with Metz (Metz agrees that it assumed IBC's labor agreement with the Leavenworth workers, but argues that this assumption did not include the seniority

rights of the former IBC workers), and the labor contract states that claims such as plaintiffs' will be arbitrated, and that the arbitrator's decision will be binding on all the parties. In these circumstances, Metz is entitled to rely on the arbitrator's award as a bar to subsequent litigation of the claim unless the plaintiffs prove that the arbitration "process has fundamentally malfunctioned by reason of the bad-faith performance of the union," *Hines v. Anchor Motor Freight,* 424 U.S. 554, 569, 96 S.Ct. 1048, 1058, 47 L.Ed.2d 231 (1976), in which case plaintiffs can avoid the bar. This requires that plaintiffs show that the Union violated its duty of fair representation and that this breach tainted or "seriously undermine[d] the integrity of the arbitral process." *Id.* at 567, 96 S.Ct. at 1058.

Therefore the immediate focus in this case is to determine whether there was a breach of the duty of fair representation; if not, then the entire case is over, because the Union has no liability and the arbitrator's award must stand. If the duty was violated, then it must be determined whether the breach tainted the arbitration; if not, Metz must win because it will be entitled to rely on the arbitrator's decision. This was the approach taken by the District Court in its conscientious consideration of the motion for judgment n.o.v., and it ruled that the evidence was insufficient as a matter of law to establish either that the Union violated its fair-representation duty or that any such breach tainted the arbitration, and, accordingly, entered judgment n.o.v. for both defendants without reaching plaintiffs' claim against Metz. To those rulings we now turn.

II.

■ Plaintiffs alleged that the Union violated the duty of fair representation in two respects: first, by not negotiating with Metz to protect their seniority rights at the time of the sale, and second, by not representing their interests fairly at the arbitration. To establish a violation of the statutory duty of fair representation, plaintiffs must show that the Union was hostile, dis-

criminatory, perfunctory, arbitrary, or dishonest, or acted in bad faith in representing their interests. See *Vaca v. Sipes*, 386 U.S. 171, 188–95, 87 S.Ct. 903, 915–19, 17 L.Ed.2d 842 (1967). To hold the Union liable for damages on proof that it was any less culpable would infringe on the "wide range of reasonableness [that] must be allowed a statutory bargaining representative in serving the unit it represents ..." *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953).

## A.

On their first theory, plaintiffs produced the testimony of Marlin Lessmann, Metz's general counsel, that he told Bernard Clausen, the president of Local 433, within one or two days of the purchase that Metz considered plaintiffs to be newly hired as of February 19, 1983. Tr. I:75–76. Clausen denied this. Both testified that Lessmann informed the Union that Metz intended to operate the Leavenworth plant and the Nicholas plant in tandem for a time after the purchase, and Lessmann stated that he told Clausen that there probably would be a consolidation in the near future. Tr. I:91. One plaintiff, James Walker, testified that near the end of February he asked Clausen what was going on in relation to the sale of the Leavenworth plant, and "[Clausen] said we should have—we had our jobs, 'Don't worry,' we had our jobs." Tr. I:181.

■ Construing this evidence and all reasonable inferences from it in favor of plaintiffs, as we must, the jury could have credited Lessmann's and Walker's testimony and found that Clausen knew that Metz considered plaintiffs to be new hires, and that it contemplated consolidating the two plants, but told one of plaintiffs not to worry about his job. The jury could have inferred from this that Clausen knew that plaintiffs' jobs were at risk, refused to negotiate to protect their interests, and then lied to one of them about their precarious situation. This is sufficient to establish a violation of the fair-representation duty.

The District Court noted this evidence, but held that other evidence and factors made the jury finding unsupportable. First, it found this finding inconsistent with the jury's additional finding that Metz agreed to assume plaintiffs' seniority rights from IBC. If the latter finding is accepted, the reasoning goes, then the Union's only duty under the collective-bargaining agreement was to arbitrate the seniority issue, and the Union discharged this duty. Therefore there could be no violation of the fair-representation duty.

We disagree with this conclusion. All of the evidence at trial indicated that the Union knew that the purchase agreement existed, but did not know its terms, especially that it contained language of assumption. Thus the language of the purchase agreement played no role in the Union's decision not to negotiate; at most that language was a fortuitous circumstance that relates to what would have happened had it negotiated, not to what actually did occur. There is evidence that supports the inferences that the Local refused to act to protect plaintiffs from a known risk to their seniority and deceived them in the process. This establishes a violation of the fair-representation duty.

The District Court also reasoned that the Union had no reason to know that plaintiffs' seniority was in jeopardy until the lay-offs began in the first week of March 1983, so it had no duty to negotiate before then. But if Lessmann's testimony is accepted, and in this context it must be, then it appears that the Union knew within one or two days of the purchase that Metz would treat plaintiffs as new hires. At that point, it could not refuse to represent plaintiffs' interests.

Finally, the District Court ruled that any negotiated solution would have to have been submitted to a ratification vote by the affected employees, and, since the Nicholas Street employees greatly outnumbered the Leavenworth workers (78 full-time and 33 part-time to 41 full-time and 21 part-time, District Court Ex. 3, at 2), any solution treating the Leavenworth group more favorably than the other employees would

have been defeated. Thus negotiation would have been futile, and the Union should not be held liable for failing to undertake a futile effort. We note first that this argument goes to the issue of the proper remedy, not to whether the Union acted in bad faith in failing to negotiate. And second, assuming that only the Leavenworth and Nicholas Street employees would have voted (we cannot determine from the record who would have had the right to vote,[1] and the parties before us disagree on the issue), it simply does not appear that *any* proposed solution would have favored one or the other group exclusively. Indeed, the most probable compromise, dove-tailing the two groups, would have benefitted the seventy or eighty most senior employees in the two groups, and these would have been a majority of the voters.

■ In support of the judgment n.o.v., defendants argue that the Union would have breached its duty of fair representation to the Nicholas Street employees if it had negotiated to protect plaintiffs' antagonistic interests. But this overlooks the good-faith element of the duty. There is evidence to support a finding that the Union was dishonest in its representation of plaintiffs. If, however, the Union had in good faith discharged its duty to plaintiffs by negotiating with Metz, it does not follow that it would have represented the Nicholas employees in bad faith. A Union can represent conflicting interests, without fear of violating the fair-representation duty, so long as it does so in good faith. See, *e.g.*, *Ryan v. New York Newspaper Printing Pressmen's Union No. 2*, 590 F.2d 451 (2d Cir.1979).

■ Defendants also argue that the evidence was uncontroverted that, had the Union negotiated the seniority issue with Metz before the lay-offs, Metz would have refused to make any concessions and would have laid off the plaintiffs anyway. This, again, is an argument about the appropriate relief, not whether the Union violated its duty. That negotiation would have been futile does not negate the Union's liability for bad-faith failure to negotiate; at most it demonstrates that plaintiffs did not suffer any ascertainable harm as a result of the breach of duty. Whether this is so must be determined at the remedies trial on remand.

**B.**

The jury also found that the Union violated its fair-representation duty in the way it handled the arbitration. The evidence on this issue, again construed most favorably for plaintiffs, was that Metz mailed lay-off notices to some of plaintiffs about March 1, 1983, and to the others about a week later. A grievance was filed on about March 4. On March 12, 1983, the Union held a meeting of the general membership of all of its Omaha bargaining units, at which it announced that it would arbitrate the seniority dispute caused by the layoffs, but would remain neutral as between the competing groups. Each group was asked to appoint two representatives to appear at the arbitration.

Plaintiff James Walker testified that he had the following exchange with the Local's president during the March 12 meeting:

Q. What did you ask and who were you asking?

A. Mr. Clausen.

---

1. There are different statements in the record. Clausen testified that every Union member in Omaha (a group that included more than just the Metz and former IBC workers) had the right to vote on whether to ratify the general collective-bargaining contract initially. Tr. I:134. Harry Smith, the Local's attorney, testified that only the Leavenworth and Nicholas Street members would have voted on a negotiated solution to Metz's consolidation of operations at the Leavenworth plant, *id.* at 166. The jury was not obliged to believe either of these witnesses. The

District Court should determine on remand who would have voted to ratify a negotiated solution to the consolidation problem. Determining who would have voted will help determine the range of solutions that would have been feasible, and this will help the Court determine what would have occurred but for the Union's failure to negotiate. Plaintiffs will bear the burden of proof, and if the evidence is simply too sketchy or uncertain to justify anything more than speculation, their remedy would be merely a declaratory judgment and perhaps nominal damages.

Q. What did you ask?

A. I [asked] him would he have the purchase agreement at our Arbitration Hearing.

Q. Did he respond?

A. Yes. He said he would have it there.

Tr. I:185.

Walker and another plaintiff, William Marsh, were chosen to represent the former IBC employees at the arbitration. On March 19, 1983, they met with several Union representatives, including Harry Smith, the Local's attorney, and Clausen in Sioux City, Iowa, to discuss the arbitration. The representatives of the Nicholas Street employees met with those officials later that day. The Union advised each group that it could retain independent counsel for the arbitration, and that any member of either group who wanted to testify at the arbitration could do so. At this meeting, no one asked the Union officials whether the purchase agreement would be introduced at the arbitration; Walker testified at trial that he "left that up to the—to the Union man." Tr. I:194.

Smith, the Local's attorney, handled the arbitration. He never asked for or looked at a copy of the purchase agreement before the arbitration. Instead, he telephoned Lessmann after the grievance was filed and, while they discussed the arbitration procedure, Lessmann told him that the transaction was merely a sale of assets, which did not obligate Metz to honor plaintiffs' seniority. Smith accepted Lessmann's description of the contract, and he made no further effort to investigate its terms. He was, however, present at the March 12 meeting when Clausen told Walker that the agreement would be introduced, or at any rate be available, at the arbitration.

At the arbitration, Smith called several employees from each of the competing groups to testify. Aside from these employees, the only other witness at the arbitration was Lessmann, who was called by Smith to testify about the terms of the purchase agreement. Lessmann told the arbitrator that the contract provided for a sale of assets from IBC to Metz, and, while Metz had agreed to maintain certain benefits—other than seniority—that the employees had obtained from IBC, he testified that the contract did not require Metz to assume their seniority. Metz's past practice had been to treat "acquired" employees just as it treated the former IBC workers, as new hires, and Metz had no intention of changing that practice with the IBC transaction.

The purchase agreement itself was not given to the arbitrator, and there was no suggestion at that hearing that the language of the contract deviated in any way from Lessmann's description, much less that it contained language, in Sections 3.1(c) and 3.2(b), to the effect that Metz agreed to assume IBC's collective-bargaining agreement with plaintiffs *in toto*. The arbitrator's decision reflected this; among his findings of undisputed fact was:

> Third, there was no agreement between the two companies with respect to the status of the [IBC] employees upon the transfer of the assets of that Company to Metz.

P.Ex. 3, at 6.

In addition, Clausen testified at trial that his position from the time of the purchase was that Metz had assumed IBC's collective-bargaining agreement in full and was bound to honor plaintiffs' seniority. He testified that Smith must have known his stance, and he could not explain why Smith took a position contrary to his.[2] Clausen was present at the arbitration, but Smith did not call on him to testify.

On this record, we have no trouble concluding that the jury could have found a violation of the duty of fair representation. The jury could have inferred that Clausen lied when he told Walker that he would have the purchase agreement at the arbitration. The District Court acknowledged that this inference was possible, but ruled

---

**2.** In a post-hearing brief, Smith did argue that Metz had assumed the IBC collective-bargaining agreement, but he did not supply a copy of, or quote from, the purchase agreement in support of this argument.

that a deception by Clausen could not establish a violation of the fair-representation duty because

> Mr. Walker and the other IBC employees knew the attorney [rather than Clausen] was handling the grievance hearing. Thus, even if the jury found that Mr. Clausen lied to Mr. Walker about the sales contract, that finding does not support the conclusion the Union's attorney treated the IBC employees and their claims dishonestly.

*Thomas v. Bakery, Confectionery and Tobacco Workers Union Local #433,* No. CV 83-0-652 (D. Neb. Aug. 13, 1986), at 18–19. This analysis misconstrues the legal issue, which is whether the Union, not any one of its officers or agents, acted in complete good faith with regard to plaintiffs' interests. Clausen acted on behalf of the Union, and if he deceived Walker about whether the sales contract would be placed before the arbitrator, that deception is attributable to the Local. And if the Local, through its president, deceived Walker about producing the sales contract at the arbitration, it violated its fair-representation duty regardless of whether the Local's attorney conducted the arbitration in good faith.

Other evidence also supports the jury finding on this issue. Smith, the Local's attorney, did not investigate the terms of the purchase agreement any further than discussing them briefly with Lessmann, who as Metz's general counsel was obviously interested in the outcome of the arbitration. Smith accepted Lessmann's account apparently without question, and that description was the only evidence of the contract put before the arbitrator. Yet Smith knew that the words of the contract would be material to the dispute if they provided for assumption of plaintiffs' seniority, Tr. I:153–54, and, according to Clausen, Smith must have known the position Clausen took as president of the Local—that Metz had assumed the IBC collective-bargaining agreement *in toto.* In addition, Smith was present at the March 12 meeting when Clausen told Walker that the purchase agreement would be at the arbitration.

This evidence was sufficient for the jury to find at least that Smith was perfunctory in his representation of plaintiffs' interests. The District Court apparently thought so too, but it felt constrained to follow one of our decisions, *Smegal v. Gateway Foods of Minneapolis, Inc.,* 763 F.2d 354 (8th Cir. 1985), *after remand,* 819 F.2d 191 (8th Cir.1987), which, in its view, required entry of judgment n.o.v. *Smegal* involved a complex series of transactions, including a partial sale of assets, from plaintiffs' former employer to their new employer. One of the agreements provided that the entire transaction was conditioned on the new employer's reaching a satisfactory labor agreement with the union within a short time. The union was unaware of the condition, and negotiated an agreement within the allotted time. Later, after the plaintiff union members discovered the condition, they sued the union on the theory that, had the union investigated the contracts and found the condition, it would have had much greater bargaining power and could have negotiated a labor agreement that would have been much more favorable to them. We held that the union's failure to review the language of the agreements was at most negligence, and thus insufficient to establish a violation of the duty of fair representation.

This case is distinguishable. In *Smegal* the union had no reason to think that the agreement contained terms favorable to the plaintiffs; nor was the situation one where the words of the contract between the two employers could have resolved the underlying labor issue: the contract provided only that the transaction was contingent on the purchaser's reaching a satisfactory labor agreement with the union within a certain time. Here, by contrast, the major issue at the arbitration was whether Metz had agreed to assume plaintiffs' seniority rights from IBC. This issue turned primarily on the terms of the contract between Metz and IBC. The Union did argue to the arbitrator that Metz expressly agreed to assume those rights, but the only evidence it produced to support this theory was Metz's interpretation of the

agreement, and, of course, it was against Metz's interests to construe the contract to require assumption. Lessmann's testimony gave no indication to the arbitrator that the purchase agreement contained broad language of assumption that supported plaintiffs' theory. In addition, in light of Clausen's belief that Metz had assumed IBC's labor agreement and Walker's request that the Union produce the purchase contract at the arbitration, the Union should at least have requested a copy of it from Metz. The jury could reasonably have found that the Union's failure to make any attempt to obtain or introduce the purchase agreement at the arbitration reduced its representation on the express-assumption theory to a mere formality, an empty gesture. This is the essence of perfunctory representation.[3]

### III.

■ The District Court held that even if the Union violated the duty of fair representation, the evidence was insufficient to establish that the breach tainted the arbitration, so the arbitrator's decision would bind the parties in any event. See *Hines, supra,* 424 U.S. at 567–72, 96 S.Ct. at 1057–60. Even though the only evidence of the purchase agreement before the arbitrator was Lessmann's interpretation of it, the Court reasoned that this was sufficient to inform the arbitrator of the fact of the sale, which was the "essential" fact. Moreover, if the arbitrator thought that the contract terms themselves were essential, he could have requested a copy of the agreement; that he did not demonstrates that the terms were not essential. Since the arbitrator had all of the essential facts

before him, the arbitral process was not tainted.

We disagree. The question for the arbitrator was whether Metz had broken the labor contract, and this turned in part on whether Metz had agreed to assume IBC's labor contract. The most important evidence on this issue was the language of Metz's promise to IBC, for the starting point in any interpretation of an agreement is the contract itself. In addition, we disagree that the fact of the sale was the "essential" fact; on this issue the essential fact was whether Metz promised to assume plaintiffs' seniority rights. And the fact that the arbitrator did not ask for a copy of the contract may indicate only that he had no reason to believe that the contract terms differed from Lessmann's description, not that he deemed the contract unessential.

The jury was within its rights in finding that the absence of the contract "seriously undermine[d] the integrity of the arbitral process." *Hines,* 424 U.S. at 567, 96 S.Ct. at 1058. The arbitrator had no knowledge of the contract's assumption clause, which was the strongest evidence in support of plaintiffs' legal theory. Without that evidence, plaintiffs' chances of proving express assumption were practically nil, especially in light of Lessmann's testimony. With that evidence, their chances would have been much greater. Thus the failure to present the contract to the arbitrator was a serious flaw in the procedure.

### IV.

■ Metz and the Union argue that, if the judgment n.o.v. in their favor is not to be affirmed, they should at least receive a new trial. The Union claims that the jury

---

**3.** Plaintiffs argue that since Smith is an attorney, the Union should be held to the standard of conduct of a reasonable attorney in its handling of the arbitration, and any breach of that standard establishes a violation of the duty of fair representation. We have rejected this argument before, see *Curtis v. United Transportation Union,* 700 F.2d 457, 459 (8th Cir.1983), and we do so again here. A union representative need not be a lawyer and should not be held to a lawyer's standard of care.

Defendants argue, by contrast, that at worst Smith was guilty of mere negligence in not

offering the purchase contract in evidence. That kind of default is not sufficiently grave to deserve condemnation as "perfunctory." See *Stevens v. Teamsters Local 600,* 794 F.2d 376 (8th Cir.1986). Even if this argument is correct, the jury verdict here must still be upheld, because Clausen's deception of Walker could have been found to amount to dishonesty, which constitutes a breach of the duty of fair representation, even if the Union's conduct was otherwise better than perfunctory.

instruction on whether the violation of the fair-representation duty tainted the arbitration was erroneous in three respects: (1) it stated the wrong legal standard; (2) it did not adequately define the terms "tainted" and "seriously undermined"; and (3) it violated the policy of finality of arbitral decisions.

> The instruction read in part:
>
> If you find that the plaintiffs have proven ... that the Union breached its duty of fair representation ..., then you must ... determine whether the plaintiffs' interests were prejudiced by the breach....
>
> In order to [prove] that the interests of the plaintiffs were prejudiced by the breach ... plaintiffs must prove by a preponderance of the evidence that the conduct of the ... Union tainted, that is seriously undermined, the integrity of the arbitration process.

Designated Record, at 91. This accurately stated the law, *Hines*, 424 U.S. at 567, 96 S.Ct. at 1058, and we find no error in it. The meaning of the words "tainted" and "seriously undermined" is not beyond the ken of a reasonable juror, so no definition was necessary. And the policy of finality of arbitration decisions was considered and accommodated by the Supreme Court in fashioning this standard. See *id.* at 567–72, 96 S.Ct. at 1057–60.

 Metz argues that the Court erred in submitting to the jury the question whether the purchase agreement bound Metz to assume IBC's labor obligations. We disagree. While construction of an unambiguous contract is a matter of law for the court, if the language is ambiguous its meaning becomes a question of fact for the jury. Here, in light of Metz's evidence of its intent and past practice, the assumption language in sections 1.1(c), 3.1(c), and 3.2(b) was sufficiently ambiguous to present a jury question. Metz also argues that there is no evidence to support the jury's finding that it expressly or impliedly assumed the seniority provisions of IBC's labor contract, but we find the language of the purchase agreement itself sufficient to support that finding.

## V.

We reverse the judgment n.o.v. and affirm the denial of a new trial. We remand this cause for reinstatement of the jury's verdict and for determination of relief.

It is so ordered.

HENLEY, Senior Circuit Judge, concurring and dissenting.

Even though the evidence in question is less substantial than one might desire it to be, I can agree with the majority that the jury could have inferred that Clausen knew plaintiffs' jobs were at risk, refused to negotiate, and then lied about plaintiffs' precarious situation. I could further agree that the Union had a duty to negotiate and breached it. Even so I would affirm judgment n.o.v. on this aspect of the case because on the record it is clear that there is no causal relationship between failure of the Union to negotiate and any injury to plaintiffs. As the district court found:

> The evidence is uncontradicted that the Union must obtain majority approval by its membership of any negotiated contract provision. Similarly, the evidence is uncontradicted that the IBC employees became Metz employees on February 19, 1983. Further, as stated earlier, the IBC employees and the Metz workers possessed antagonistic interests. And, finally, the evidence stands undisputed that the Metz group outnumbered the IBC unit by almost two to one. Thus, the evidence supports only the conclusion that if the Union had negotiated with Metz and obtained full recognition of IBC seniority for all the IBC employees (endtailing the Metz workers) or for some of them (dovetailing with the Metz workers), the tentative proposal could not have been approved unless the members of the majority Metz group voted against their own economic interests. Accordingly, the jury's verdict cannot stand since it necessarily rests on the irrational inference from the evidence that the majority group would have voted against its own interest. Further, insofar as the Union had a right to rea-

sonably believe that seniority negotiations would be futile or would not result in an agreement favorable to the IBC workers, the evidence cannot support a finding that the Union acted arbitrarily or dishonestly in failing to negotiate with Metz.

This reasoning is most persuasive and I find unacceptable the speculation of the majority that a possible compromise of dovetailing is sufficient to support a finding of liability. *Barrett v. Thorofare Markets, Inc.*, 452 F.Supp. 880, 883–84 (W.D. Penn.1978) (plaintiffs could not prove how local would have voted on pension agreement), cited with approval in *Anderson v. United Paperworkers International Union*, 641 F.2d 574, 580–81 (8th Cir.1981). If there is no showing of probable injury, failure to negotiate should not call for reversal and remand for determination of a remedy.

With respect to the Union's failure to introduce into evidence before the arbitrator the Metz-IBC sales agreement, I find at most negligence for which no liability attaches.

In the first place, it is somewhat anomalous to suggest that the Union had a duty to negotiate to protect the IBC employees' seniority rights, but even though they did not do so, those employees' rights were protected by the contract nonetheless. If the contract so clearly gave that protection, what purpose would negotiations have served? A second, but related, problem with the jury's verdict is that the contract is simply too vague on the subject of the IBC employees' rights upon transfer to Metz to assume, as the court appears to do, that contract introduction would have made any difference at the arbitration. While the agreement provides in two separate provisions that Metz was (1) to assume the IBC collective bargaining agreement, and (2) to enter into a novation with the IBC employees respecting that agreement, it nowhere provides that the IBC employees would be dovetailed with the Metz employees or that they would not be endtailed. Both groups were covered by an industry-wide agreement, which did not provide for either dovetailing or endtailing. The agreement as it applies to Metz and its original employees did not provide for dovetailing should Metz acquire a new company, and Metz could not have added a term to that agreement without the Union's participation simply by entering into a sales contract with IBC. *See, e.g., NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962) (employer who changed wage and benefit provisions without consulting union violated duty to bargain collectively under the NLRA). The arbitrator correctly applied the rule that seniority rights can "exist only by virtue of and to the extent provided by a bargaining agreement." Arbitrator's Decision and Award at 6 (citing *Local 1251, UAW v. Robertshaw Controls Co.*, 405 F.2d 29, 33 (2d Cir.1968) (en banc)). Thus, with respect to seniority undoubtedly the sales agreement conferred no greater rights than the bargaining agreements, and the arbitrator ruled that those agreements did not dispose of the issue.

Consequently, although we as well as a jury might consider the Union's actions with regard to the arbitration distasteful, the plaintiffs simply have not shown that the Union's conduct in fact was a cause of any injury to them, and thus there can be no liability. *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 568, 96 S.Ct. 1048, 1058, 47 L.Ed.2d 231 (1976) (focus is on "whether there is a substantial reason to believe that a union breach of duty contributed to the erroneous outcome"); *Humphrey v. Moore*, 375 U.S. 335, 351, 84 S.Ct. 363, 372, 11 L.Ed.2d 370 (1964) (agreeing with trial court it was "idle speculation" for employees to assume result of hearing "would have been different had the matter been differently presented" by the union); *Anderson*, 641 F.2d at 580–81, 580 n. 8, and cases there cited.

While I agree with the court that we should affirm the denial of a new trial, largely upon the findings and reasoning of the district court, I would affirm the judgment n.o.v. as well. *See* 8th Cir. R. 14.