Frank **ACKLEY** and Steven Cole, Plaintiffs–Appellants,

v.

**WESTERN CONFERENCE OF TEAMSTERS, et al., Defendants–Appellees.**

Nos. 90–55438, 90–55702.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 10, 1991.

Decided Feb. 21, 1992.

---

Michael J. Shelley, Robert Vogel, Wohlner, Kaplon, Phillips, Vogel, Shelley & Young, Encino, Cal., for defendants-appellees.

Before TANG, REINHARDT and WIGGINS, Circuit Judges.

REINHARDT, Circuit Judge:

The primary question presented by this case is whether the equal rights and freedom of speech guarantees of section 101(a) of the Labor–Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 411(a) (1988), require union leaders to make a full disclosure of all of the terms and provisions of a collective bargaining agreement prior to submitting the agreement to the union membership for ratification. We hold that they do not. There is no provision in the LMRDA that requires that a labor contract be submitted to the membership for ratification. Rather, the question of contract approval constitutes an internal union affair. It is left to the union and its membership to determine whether ratification is required, and if so, what procedures apply. Ordinarily, it is the union's constitution or bylaws that govern these matters (although in rare instances a successful action for breach of the duty of fair representation might be brought). However, a failure to follow the union's internal rules, including its procedures governing contract ratifications, constitutes a violation of the union's obligations to its members, and is actionable as a breach of contract under section 301(a) of the Labor–Management Relations Act (LMRA), 29 U.S.C. § 185(a) (1988). No such breach is alleged here and no remedy is sought, under § 301(a) or otherwise, for any violation of the union's constitution or bylaws. Accordingly, we affirm the district court's grant of defendant's motion to dismiss pursuant to Fed.R.Civ.P. 41(b).

I

Appellants Frank Ackley and Steven Cole are Teamsters employed by Matlack,

Julie Fosbinder, Tucson, Ariz., Paul Alan Levy, Public Citizen Litigation Group, Washington, D.C., for plaintiffs-appellants.

Inc., a nationwide hauling company. Together with approximately 300 other Teamsters employed in Matlack's western region, they were covered by the 1988–1991 Master Tank Agreement negotiated between Matlack and appellee Western Conference of Teamsters (WCT), a subordinate organization of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, AFL-CIO. The Matlack Teamsters covered by the agreement belong to six local unions affiliated with WCT.[1] Ackley and Cole are members and shop stewards of Local Unions 692 and 315, respectively.

Prior to 1988, members of the six locals were covered by a multi-employer collective bargaining agreement between WCT and the Western States Bulk Commodity Haulers Association, of which Matlack is a member. The multi-employer agreement expired in June, 1988. In 1987, Matlack notified WCT of its intent to withdraw from the multi-employer bargaining arrangement and bargain independently with the union. Matlack subsequently filed petitions with the National Labor Relations Board (NLRB) to request that the NLRB certify three separate collective bargaining units for the upcoming negotiations. The NLRB instead determined that the local unions composed of Matlack employees would constitute a single collective bargaining unit. Negotiations with WCT and the business representatives of the six local unions commenced in or about May, 1988. To counter Matlack's attempts to break up the bargaining unit, the union negotiators agreed not to release information about proposed terms and conditions to the membership until a complete agreement was ready for ratification.

The Teamsters' constitution requires membership ratification of collective bargaining agreements negotiated by the union leadership, but does not specify the

particular method to be used. Prior to 1988, on all occasions except one, ratification of agreements negotiated by WCT occurred as the result of a mail referendum. Members received written disclosure of proposed changes in the union contract approximately ten days before ballots were due. In 1982, ratification occurred at a series of open meetings held in the local unions. At the local unions' 1988 pre-negotiation meetings, the membership approved an open meeting ratification procedure for the 1988–1991 agreement.[2]

On August 12, 1988, local union leaders notified the membership that ratification meetings would be held in each local union on August 14. Ackley contacted the business representative for Local Union 692 to request information about the terms of the proposed agreement, but his request was refused. The business representative for Local Union 315 read Cole a summary of the terms of the proposed agreement over the telephone, and stated in response to a question from Cole that no other changes had been made. At the ratification meetings held on August 14, union leaders read the same summary to the membership. The summary of terms included changes to the monetary terms of the collective bargaining agreement, but omitted proposed changes to other provisions of the contract. The union leaders urged the membership to reject the proposed agreement, and ratification failed by a vote of 148 to 4. Cole spoke out against ratification; Ackley was silent.

On August 17, the membership was notified of a second set of ratification meetings to take place on August 21. Both Ackley and Cole again contacted their business representatives, and both were read a summary of the provisions of the proposed agreement. Again, this summary included only changes to the monetary terms of the

1. These locals include appellee Local 692 in Long Beach, California; Local 495 in Los Angeles, California; Local 315 in Martinez, California; Local 291 in San Leandro, California; Local 81 in Portland, Oregon; and Local 741 in Seattle, Washington. Local 690, in Spokane, Washington, was not affected by the 1988–1991 agreement.

2. During the pre-negotiation meetings, the Matlack Teamsters were also given an opportunity to submit suggestions regarding desired changes to the terms of the previous (1985–1988) agreement.

previous contract. At the meeting, union leaders again read the summary of terms to the membership and again recommended that the members reject the agreement. The agreement was defeated by a vote of 168 to 28. Again, Cole argued against ratification and Ackley was silent.

On August 25, the Matlack Teamsters were notified that a third set of ratification meetings would occur on August 28. When Cole and Ackley telephoned their respective business agents for information about the third proposed agreement, the agents refused to release information prior to the meetings. The day before the meetings, Ackley's agent finally agreed to let Ackley examine the agreement. Ackley spent three hours at Local 692 going over the document, but he did not bring a copy of the 1985–1988 agreement with him for purposes of comparison.

This time, unlike the first two times, the union leadership recommended that the members accept the third proposed agreement. Again, the leaders read or distributed a summary of terms that consisted entirely of monetary changes.[3] Although Ackley testified that he had spoken to a number of drivers before the meeting to indicate that he wished to delay the vote, he did not ask to address the members at the meeting or call for a delay or further discussion. Cole again argued against ratification, and his local, Local 315, voted to reject the agreement. However, the bargaining unit as a whole voted 95 to 75 in favor of ratification. According to the testimony of plaintiffs' witnesses, the new 1988–1991 agreement included a number of changes to nonmonetary provisions of the previous contract that had not been disclosed to the membership.

Ackley and Cole filed suit against WCT, Local Union 692, and Matlack under section 101 of the Labor–Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 411, and section 301 of the Labor–Management Relations Act (LMRA), 29 U.S.C. § 185. They claimed that the union's failure to disclose material changes in the collective bargaining agreement prior to the ratification vote violated the equal voting rights and freedom of speech provisions of section 101 and breached the duty of fair representation required by section 301. They did not, however, allege that there was any breach of the union constitution or bylaws, or set forth any cause of action under section 301 based on such a breach.

Ackley and Cole initially sought rescission of the 1988–1991 agreement and an injunction regarding the conduct of future ratification votes. They later agreed to the dismissal of Matlack as a defendant and abandoned their claim for rescission in favor of a request for declaratory judgment. A two-day trial was held. At the close of plaintiffs' case, the district court granted defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 41(b). The court's order of dismissal authorized WCT to seek attorneys' fees from plaintiffs. The court later awarded defendants $16,070.40 in attorneys' fees. Ackley and Cole appeal from the district court's order of dismissal and from the supplemental order awarding attorneys' fees. The two appeals were consolidated by order of this court.

## II

■ Appellees contend that because Ackley and Cole have abandoned their claim for rescission of the 1988–1991 agreement and seek only prospective relief, this case should be dismissed as moot. A case is moot when subsequent events have eradicated the effects of the alleged wrong and there is no reasonable expectation that it will recur. *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979); *Lodge 1380, Bhd. of Ry., Airline & Steamship Clerks (BRAC) v. Dennis*, 625 F.2d 819, 822 (9th Cir.1980). Appellees note that the 1988–

---

**3.** Appellees claim that Cole has admitted that the entire agreement was read and distributed at Local 315. According to Cole, his affidavit stating that "the agreement" was distributed referred to the one-page summary of monetary terms that he believed contained all of the changes to the previous agreement. There can be little doubt that the entire agreement, which exceeded 140 pages, was not distributed.

1991 agreement had already been in effect for nearly two years at the time of this appeal, and maintain that any need for relief in connection with future ratification proceedings is wholly speculative.

A case is not moot if the alleged wrong is "'capable of repetition, yet evading review.'" *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 546, 96 S.Ct. 2791, 2797, 49 L.Ed.2d 683 (1976) (quoting *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911)). This standard is met if the duration of the injury is shorter than the time required for litigation, and if there is a reasonable likelihood that the same party will be subject to the injury again. *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975); *NAACP v. City of Richmond,* 743 F.2d 1346, 1353 (9th Cir. 1984).

■ Contrary to appellees' suggestion, the wrong alleged by Ackley and Cole satisfies this standard. When procedural wrongs involving the ratification process are alleged, the length of time a collective bargaining agreement has been in force is irrelevant to the issue of mootness. The relevant time period to be considered in determining whether such wrongs are likely to evade review is the duration of the ratification process itself. Absent impasse, one collective bargaining agreement succeeds another after no more than a few months of negotiation. Litigation of disputes arising out of negotiation and ratification proceedings is not feasible within so short a period. *Cf. First National Bank of Boston v. Bellotti,* 435 U.S. 765, 774, 98 S.Ct. 1407, 1414, 55 L.Ed.2d 707 (1978) (holding that an 18–month election period is too short to allow complete judicial review of constitutional issues). In this case, litigation has lasted over three years, and the 1988–1991 agreement between WCT and Matlack has already expired.

■ Moreover, absent a formal resolution to the contrary, there is a reasonable likelihood that WCT and the leadership of the local unions will conduct future ratification votes in the same manner as they did in 1988. *See, e.g., International Org. of Masters, Mates & Pilots v. Brown,* — U.S. —, 111 S.Ct. 880, 885, 112 L.Ed.2d 991 (1991); *Lodge 1380, BRAC,* 625 F.2d at 822–23. Appellees erroneously imply that Ackley and Cole bear the burden of proving that the conduct at issue is capable of repetition. It is the defendant, not the plaintiff, who must demonstrate that the alleged wrong will not recur. *Iron Arrow Honor Soc'y v. Heckler,* 464 U.S. 67, 72, 104 S.Ct. 373, 375, 78 L.Ed.2d 58 (1983). Appellees have offered no such proof.

### III

As an initial matter, Ackley and Cole argue that the district court committed a number of errors that require reversal of its ultimate findings. They challenge four of the district court's findings of fact and contend that two of its evidentiary rulings constitute reversible error. We examine each of the alleged errors in turn.

### A

■ We will not overturn a district court's findings of fact unless those findings are clearly erroneous. *Johnson v. United States Postal Serv.,* 756 F.2d 1461, 1464 (9th Cir.1985). We decline to find error where "ample evidence" supports the findings. *Maykuth v. Adolph Coors Co.,* 690 F.2d 689, 695 (9th Cir.1982).

The district court found that the local union leadership recommended against ratification of the second proposed agreement. Appellants note that this finding directly contradicts Cole's testimony that the leaders of Local Union 315 supported the proposed agreement. In light of the fact that appellant Ackley's testimony was contrary to that of appellant Cole and the fact that the membership rejected the second proposed agreement by a vote of 168 to 28, we cannot say that the finding is clearly erroneous. In any event, even if an error occurred, it is of no consequence. Plaintiffs offer no explanation, and we can conceive of none, as to how the alleged error could have affected the outcome of this case.

Another finding states that Ackley did not bring a copy of the 1985–1988 agreement with him when he went to Local Union 692 on August 27 to examine the third proposed 1988–1991 agreement. Appellants concede that this finding is accurate, but challenge it as "misleading." We are not aware of any authority for the proposition that a party may successfully challenge a concededly accurate finding of fact.

The third finding challenged by appellants sets forth the district court's conclusion that at the ratification meetings held in Local Union 692, neither Ackley nor any of the other members asked any questions about the substantive provisions of the proposed agreement. Ackley and Cole claim that Ackley's testimony establishes just the opposite. Ackley's testimony establishes that at various times he discussed his reservations regarding the proposed agreement privately with some of the other drivers, and that immediately prior to the third and final ratification meeting he notified many members of Local 692 of a change that he had discovered in the grievance procedure. However, there is no indication that he or anyone else raised this issue or the possibility of any other undisclosed changes during the meeting. Rather, Ackley's testimony supports the district court's conclusion that he and his fellow Teamsters kept their questions to themselves. Once again, appellants charge that this conclusion is misleading. Once again, however, that charge is simply irrelevant.

■ Finally, Ackley and Cole challenge the district court's finding that Cole had ample opportunity to learn of and discuss the salient facts regarding the proposed agreement. They contend that this conclusion goes to the heart of their claim for relief under section 101 and therefore is subject to *de novo* review by this court.

*Johnson*, 756 F.2d at 1465. At the least, the question whether Cole had ample opportunity to learn of and discuss the terms of the proposed agreement is a mixed question of law and fact. Thus, the district court's finding is arguably subject to *de novo* review under the *Johnson* "ultimate finding" standard. *Id.* However, we need not determine whether or not the district court erred in finding as it did in view of 1) our conclusions that, as a matter of law, the LMRDA does not provide a right to the disputed information, and that, regardless of the truth or falsity of the challenged finding, plaintiffs' cause of action for breach of the duty of fair representation fails on other grounds, and 2) the fact that no cause of action for breach of the union's constitution or bylaws was alleged.

**B**

We review evidentiary rulings for abuse of discretion and will not reverse absent some prejudice. *Kisor v. Johns–Manville Corp.*, 783 F.2d 1337, 1340 (9th Cir.1986). Evidentiary rulings result in reversible error unless it is more probable than not that the result in the district court was untainted by the error. *Pau v. Yosemite Park & Curry Co.*, 928 F.2d 880, 888 (9th Cir. 1991).[4]

During the trial, appellants made an offer of proof as to what the deposition testimony of individual union members would have been had the court granted a continuance of the trial so that the depositions could have been taken. According to the proffer, the individuals would have testified as to the materiality of undisclosed, nonmonetary changes to the collective bargaining agreement. Appellants charge that the district court's exclusion of this evidence impaired their efforts to prove that the Matlack Teamsters were denied a meaningful vote. Appellants made a fur-

---

**4.** In *Pau,* we noted the existence of two different formulations of the test for prejudice in civil cases. 928 F.2d at 888 n. 2. Under the rule set forth in *Haddad v. Lockheed California Corp.,* 720 F.2d 1454, 1459 (9th Cir.1983), the reviewing court must find prejudice unless it concludes that, more probably than not, the result in the lower court was untainted by the error.

By contrast, in *Kisor v. Johns–Manville Corp.,* 783 F.2d 1337, 1340 (9th Cir.1986), we stated that a reviewing court will find prejudice if it concludes that more probably than not, the lower court's error *did* taint the result. As in *Pau,* we find the distinction between these approaches irrelevant to the present case; therefore, we do not address it.

ther offer of proof that, if deposed, the union members would state that they would now vote against ratification. Although the issue is properly one of whether the district judge abused his discretion in denying the requested continuance, we will, for present purposes, treat the ruling as if it constituted a determination to exclude evidence offered by appellants.[5] Even under that standard, however, any error was harmless.

█ Although we are by no means convinced that the deposition testimony the witnesses would have offered would have been at all credible, it is true that direct testimony regarding the materiality of undisclosed contract changes is relevant to the question whether union members failed to receive information important to the casting of an informed vote. However, as we will explain below, the determinative issue here is not whether the members were able to cast informed votes or even whether the failure to afford the members the information allegedly withheld violated any rights union members enjoy by virtue of the union constitution or bylaws. Rather, in light of appellants' pleadings and the evidence they introduced or attempted to introduce, the principal question is whether the failure to inform the membership fully regarding the terms of the proposed contract violated the free speech or equal protection provisions of the LMRDA. In light of our conclusion that the LMRDA imposes no minimum disclosure requirements on union officials, at least when there is no statutorily created right to vote on the subject at issue, and our conclusion that no equal protection issue arises when all of the rank-and-file members are treated identically, we conclude that the exclusion of the proffered testimony did not prejudice appellants with respect to their LMRDA cause of action. *See* discussion in Part V, *infra.* We also conclude that appellants were not prejudiced with respect to their duty of fair representation claim—a claim which appellants understandably assert with considerably less enthusiasm. As to the latter claim,

the proposed testimony may have been relevant to the question whether the outcome of the third ratification vote would have been different had fuller information been available, but any error in that respect does not avail the appellants, if for no other reason than that Ackley and Cole failed to show that a different outcome would have induced the employer, Matlack, to make further concessions. *See* discussion in Part IV, *infra.*

█ The second evidentiary ruling complained of is the district court's exclusion of approximately fifty witnesses who were not listed individually on the plaintiffs' witness list. The charge of error is meritless. Local Rule 9.6 of the Central District of California imposes upon each party a continuing obligation to furnish a list of witnesses to be called in that party's case in chief, and provides that "except for good cause shown, the testimony of any such witness proffered at trial who is not listed upon a party's witness list shall be precluded." Local Rule 9.6 requires an affirmative showing of good cause for failure to comply by the party seeking to call unlisted witnesses; claims of relevance and lack of prejudice are insufficient. Here, no such showing was made. Thus, the district court did not abuse its discretion in excluding plaintiffs' witnesses, but rather properly applied the rules of court.

## IV

In granting the union defendants' motion to dismiss under Federal Rule of Civil Procedure 41(b), the district court ruled, *inter alia,* that Ackley and Cole had failed to show a right to relief under section 301 of the Labor–Management Relations Act (LMRA), 29 U.S.C. § 185 (1988), for a breach of the union's duty of fair representation. We review ultimate findings made pursuant to a Rule 41(b) motion *de novo. Johnson,* 756 F.2d at 1465. We note, first, that in their briefs on appeal Ackley and Cole barely succeeded in raising the duty

---

5. We have been unable to locate a copy of the transcript of the hearing on the request for a continuance, and although it is possible that one

could be obtained, or that the facts could be otherwise established, in view of the holding set forth in the text, there is no need to do so.

of fair representation issue, if in fact they did succeed. Nevertheless, because it is clear, both from their discussion of the evidentiary rulings and from their objections to the factual findings, that appellants intended to preserve this point before us, we will overlook the obvious procedural inadequacies in their brief.

▮ The statutory authority to represent union members in a collective bargaining process includes an obligation "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967) (citation omitted). Ackley and Cole contend that WCT and the local union leadership breached this obligation by failing to disclose changes in the nonmonetary provisions of the proposed collective bargaining agreement to the membership. Because Ackley and Cole failed to establish the requisite elements of such a claim as defined in *Acri v. International Ass'n of Machinists*, 781 F.2d 1393, 1397 (9th Cir.), *cert. denied*, 479 U.S. 816, 107 S.Ct. 73, 93 L.Ed.2d 29 (1986), the district court's grant of dismissal was proper.

▮ The duty of fair representation extends to the conduct of union officials during the negotiation of a collective bargaining agreement. *Acri*, 781 F.2d at 1397. Union members may maintain an action for breach of the duty of fair representation based on misrepresentations made by union leaders during the ratification process. *Id.* For purposes of the

case before us, we assume *arguendo* that such an action can also be brought in the event of a failure to disclose information material to the exercise of an informed vote.[6] However, to prevail in a misrepresentation case—and thus in a nondisclosure case—plaintiffs must demonstrate "a causal relationship between the alleged misrepresentations and their injury." *Id.* They must show that (1) absent the misrepresentations, the outcome of the ratification vote would have been different; *and* that (2) had it been different, the company would have acceded to the union's demands. *Id.*

The *Acri* test for causality, and particularly the second prong, is difficult to satisfy, and rightly so. Generally, the union's internal election and rulemaking processes are the proper vehicle, at least initially, for addressing members' complaints regarding the adequacy of union representation during the bargaining process. *Acri*, 781 F.2d at 1399–1400 (Reinhardt, J., concurring). A union's conduct during bargaining need only fall within " '[a] wide range of reasonableness' " to survive judicial review. *Air Line Pilots Ass'n v. O'Neill*, — U.S. —, 111 S.Ct. 1127, 1134, 113 L.Ed.2d 51 (1991) (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953)). Otherwise, during this era of economic retrenchment and reductions in contract benefits, the bargaining process would be under constant siege in the courts.

▮ Congress created the collective bargaining system in order to promote the peaceful and orderly, yet collective, resolu-

---

6. The cases that deal with the question whether liability for breach of the duty of fair representation can arise out of a union's interactions with its membership during the contract ratification process have all involved deliberate misrepresentation. The courts are in agreement that such misrepresentations will create liability if the requisite causal nexus can be proved. *Alicea v. Suffield Poultry, Inc.*, 902 F.2d 125, 130 (1st Cir.1990); *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1521 (11th Cir.1988) (dicta), *cert. denied*, 490 U.S. 1066, 109 S.Ct. 2066, 104 L.Ed.2d 631 (1989); *Swatts v. United Steelworkers*, 808 F.2d 1221, 1224–25 (7th Cir.1986); *Acri*, 781 F.2d at 1395, 1397; *Anderson v. United Paperworkers Int'l Union*, 641 F.2d 574, 576–79

(8th Cir.1981); *Deboles v. Trans World Airlines*, 552 F.2d 1005, 1017–20 (3d Cir.), *cert. denied*, 434 U.S. 837, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977). No court has yet considered whether mere nondisclosure also constitutes a breach of the union's duty of fair representation, and we need not reach that question here. We are mindful, however, of the difference between malfeasance and nonfeasance in the performance of one's duties, as well as of our admonition in *Retana v. Apartment, Motel, Hotel & Elevator Operators Union*, 453 F.2d 1018, 1025 (9th Cir.1972), that "it will be the unusual case in which hostile discrimination, bad faith, dishonesty, or arbitrary conduct can be alleged."

tion of industrial disputes and, ultimately, to ensure the long-term stability of labor-management contracts. *Cf. Carothers v. Presser*, 818 F.2d 926, 934 (D.C.Cir.1987). Both union members and employers have a strong interest in that result. Accordingly, both benefit from the rule that labor-management contracts will not be lightly set aside. Statements made by union representatives during the contract ratification process furnish insufficient justification for invalidating a collective bargaining agreement, unless a showing is made that but for those statements the ultimate outcome of the bargaining would have been different. *Acri*, 781 F.2d at 1397.

In *Acri*, we affirmed the district court's grant of summary judgment in favor of the union because the plaintiffs conceded that they could not show that the employer would have acceded to their demands even had the union remained on strike. In the case before us, Ackley and Cole proffered no evidence whatsoever that Matlack would have been disposed to agree to more generous terms had the union rejected the proposed 1988–1991 agreement a third time. Accordingly, appellants failed completely to satisfy the second prong of the *Acri* test. Thus, their claim that the union leaders breached their statutory duty of fair representation was properly dismissed.

## V

■ The principal ruling that Ackley and Cole challenge is that they failed to establish any violation of section 101 of the LMRDA, 29 U.S.C. § 411 (1988). Unlike the duty of fair representation claim, appellants argue this point vigorously. Nevertheless, we affirm. Because the union treated all members identically during the ratification process and because the LMRDA does not require that union members be provided with "meaningful" information prior to voting on contract rat-

ification, appellants' section 101 claims lack merit. If there is a remedy for the conduct they complain of, and there well may be, it lies elsewhere.

### A

Section 101(a)(1) of the LMRDA guarantees to every union member "equal rights ... to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings." 29 U.S.C. § 411(a)(1) (1988). Ackley and Cole maintain that the union leadership's decision to withhold from the rank-and-file membership information regarding the nonmonetary terms of the proposed collective bargaining agreement violated this guarantee. In light of the settled law in this circuit regarding section 101(a)(1), the district court properly rejected this argument.

Section 101(a)(1) is an anti-discrimination provision, pure and simple. To state a claim under section 101(a)(1), a union member must allege a denial of rights accorded to other members. *Calhoon v. Harvey*, 379 U.S. 134, 138–39, 85 S.Ct. 292, 295, 13 L.Ed.2d 190 (1964); *Lodge 1380, BRAC*, 625 F.2d at 826; *see also Grant v. Chicago Truck Drivers*, 806 F.2d 114, 117 (7th Cir. 1986); *Alexander v. International Union of Operating Engineers*, 624 F.2d 1235, 1240 (5th Cir.1980); *Smith v. United Mine Workers*, 493 F.2d 1241, 1244 (10th Cir. 1974). The facts surrounding the ratification of the 1988–1991 collective bargaining agreement make clear that WCT and the local union leaders furnished the same type and amount of information to all of the Matlack Teamsters and accorded them identical rights to speak at the ratification meetings. No discrimination against any member or group of members occurred.[7]

---

7. In *Christopher v. Safeway Stores, Inc.*, 644 F.2d 467 (5th Cir.1981), the Fifth Circuit reached a result that conflicts squarely with *Alexander* (which it had decided the previous year). Like the case before us, *Christopher* involved allegations that union leaders improperly withheld material information relating to a con-

tract ratification vote required by the union's constitution. No discrimination among members or groups of members was alleged. Nevertheless, the court held that the union's conduct violated section 101(a)(1), stating that it refused "to read [section 101(a)(1) ] to mean that a right created or protected by the statute may be

■ Appellants further argue that the union leaders abused their control over information relating to the contract negotiations by presenting the proposed contract to the membership in the most favorable light. The question whether the information provided was biased toward a particular outcome is irrelevant for purposes of section 101(a)(1). Section 101(a)(1) prohibits discrimination against people, not against ideas. We recognize that the conduct at issue here perpetuated, indeed exacerbated, the customary information gap between the leadership of the union and its rank-and-file members. However, unequal access to information is as inherent in the structure of the collective bargaining system as it is in our larger democratic system. *See* LMRA § 101, 29 U.S.C. § 159 (1988) (providing for the election and certification of collective bargaining representatives); LMRDA § 401, 29 U.S.C. § 481 (1988) (providing for election of union officials); *Carothers*, 818 F.2d at 934. Union leaders, by virtue of their status as collective bargaining representatives, necessarily possess more information about the progress and projected outcome of collective bargaining than union members. At the time of a ratification vote, the officials will inevitably know more about the final terms of the new agreement than the rank-and-file members. This would be the case even were we to require advance distribution of the entire agreement (in this case, over 140 pages). Information concerning discussions or informal understandings regarding the intended or actual meaning of ambiguous provisions is of critical importance in implementing union-management agreements. That information would not be available to rank-and-file members in any event. To attempt to ensure equal information for negotiators and members alike would be wholly unrealistic. *Carothers*, 818 F.2d at 934–35. "[I]t is not difficult to imagine how the Union's legitimate role as bargaining representative could be subverted" by such a rule. *Id.* at 934. The anti-discrimination provision of section 101(a) was not intended to cover the type of information disparity complained of by appellants.[8]

abridged with abandon provided there is an even-handed denial to all." *Id.* at 470. The Eighth Circuit followed *Christopher* without discussion in *Smegal v. Gateway Foods of Minneapolis, Inc.*, 763 F.2d 354, 360 (8th Cir.1985). (The *Smegal* court cited two other cases, one of which was clearly inapposite and one of which reached a result opposite to that in *Christopher*.)

The holdings in *Christopher* and *Smegal*, however, are squarely at odds not only with the holding of the Supreme Court in *Calhoon*, with prior Fifth Circuit precedent, and with Seventh and Tenth Circuit law, but also with the plain language of the statute, which requires only that "[e]very member of a labor organization shall have *equal* rights and privileges within such organization." 29 U.S.C. § 411(a)(1) (1988) (emphasis added). We decline to give section 101(a)(1) an interpretation that its language is incapable of sustaining.

8. In several cases involving section 101(a)(1) claims, courts have read the statute to require that the right to vote on union matters be extended "on an equal basis and in a meaningful manner." *McGinnis v. Local Union 710, Int'l Bhd. of Teamsters*, 774 F.2d 196, 199 (7th Cir. 1985), *cert. denied*, 475 U.S. 1121, 106 S.Ct. 1638, 90 L.Ed.2d 184 (1986). The "meaningful manner" requirement has allowed the extension of section 101(a)(1) to reach not only facially discriminatory union conduct, but also facially neutral union rules or actions that are discrimi-natory in effect. *See, e.g., McGinnis*, 774 F.2d at 199–203 (invalidating union rule requiring that elections for union stewards be held in Chicago); *Bunz v. Moving Picture Mach. Operators' Protective Union Local 224*, 567 F.2d 1117, 1122 (D.C.Cir.1977) (striking down interpretation of union constitution lowering the percentage of votes required to secure passage of a special picket assessment from 67% to 51% after only 59% of the members had voted in favor of the assessment); *see also Trail v. International Bhd. of Teamsters*, 542 F.2d 961, 966 (6th Cir.1976) (declining to require dismissal of Michigan members' claim that failure to submit a "Michigan Rider" for ratification violated section 101(a)(1) because no factual record had yet been created as to whether "Riders" negotiated for other states had been submitted to members based in those states). To sever the "meaningful manner" gloss from the more fundamental "equal treatment" requirement and allow the former alone to support a claim for violation of section 101(a)(1), however, would flout both the statutory language and scheme as well as ignore the other statutory remedies created by Congress to deal with related ills. As we have explained, section 101(a)(1) was not intended to reach all violations of union members' voting rights, but only those of a certain type. *See also* note 10, *infra*. The federal courts may not respond to union members' failure to bring the correct statutory action by affording a remedy

**B**

■ Finally, Ackley and Cole urge that the withholding of information from union members during the ratification meetings violated the LMRDA's guarantees of freedom of speech and assembly. As part of their argument, they contend that the Act requires the passage of a reasonable period of time between the disclosure of contract terms and the balloting. Again, however, appellants have failed to establish a deprivation of any right provided under the LMRDA.

Section 101(a)(2) of the LMRDA guarantees to every union member "the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views ... upon any business properly before the meeting." 29 U.S.C. § 411(a)(2) (1988). It is settled law that the scope of section 101(a)(2) is not coextensive with that of the first amendment. *United Steelworkers v. Sadlowski,* 457 U.S. 102, 108–11, 102 S.Ct. 2339, 2344–45, 72 L.Ed.2d 707 (1982). Rather, Congress sought to provide certain basic and fundamental rights to union members, while at the same time avoiding undue judicial interference with the mechanics of union self-governance. *Sheldon v. O'Callaghan,* 497 F.2d 1276, 1281 (2d Cir.), *cert. denied,* 419 U.S. 1090, 95 S.Ct. 681, 42 L.Ed.2d 682 (1974); *see also Carothers,* 818 F.2d at 934; *Smith,* 493 F.2d at 1244. Thus, section 101(a)(2) expressly provides that the rights it guarantees are "subject to the organization's established and reasonable rules pertaining to the conduct of meetings." 29 U.S.C. § 411(a)(2) (1988).

The courts of appeal have construed section 101(a)(2) to provide a remedy not only for direct reprisals against dissenters, but also for union conduct that inhibits or

threatens dissenting speech. *Lodge 1380, BRAC,* 625 F.2d at 827; *Navarro v. Gannon,* 385 F.2d 512, 518 (2d Cir.1967), *cert. denied,* 390 U.S. 989, 88 S.Ct. 1184, 19 L.Ed.2d 1294 (1968). However, Ackley and Cole have made no showing that they or any of their fellow union members were denied the opportunity to express their views about the proposed collective bargaining agreement, or discouraged from asking questions about its provisions during the ratification meetings. Instead, they contend that nondisclosure of material information rendered their freedom of expression illusory. While Ackley and Cole may have had a claim for a violation of rights guaranteed them under the union constitution, and thus grounds for a section 301(a) breach of contract action, *see* discussion in Section C, *infra,* we find no basis for any claim of a violation of the LMRDA.

■ There are two recognized bases for establishing a union member's right to information under the LMRDA. First, the LMRDA specifies that union members are entitled to access to particular categories of information; a union's failure to provide that information to its members is actionable. *See, e.g.,* 29 U.S.C. §§ 412, 414 (1988). Second, two of our sister circuits, in considering appeals relating to membership votes required by the LMRDA, have held that unions must furnish sufficient information to allow members exercising a *statutory right to vote* to do so in a meaningful manner. *Blanchard v. Johnson,* 532 F.2d 1074, 1078–79 (6th Cir.1976), *cert. denied,* 429 U.S. 834, 97 S.Ct. 100, 50 L.Ed.2d 100 (1976), and 429 U.S. 869, 97 S.Ct. 180, 50 L.Ed.2d 149 (1976); *Sheldon v. O'Callaghan,* 497 F.2d 1276, 1282 (2d Cir.), *cert. denied,* 419 U.S. 1090, 95 S.Ct. 681, 42 L.Ed.2d 682 (1974).[9] The case before us does not fall in either category.

under section 101(a)(1) that is not warranted by the facts alleged.

9. *Blanchard* involved a challenge to the manner in which a local union had conducted an affiliation referendum. The district court treated the vote as a union election, which is required by section 401 of the LMRDA, 29 U.S.C. § 481 (1988), and held that section 101(a) guaranteed

union members the right to a meaningful vote in union elections. 532 F.2d at 1076. The Sixth Circuit did not disagree with this characterization. *Id.* at 1078. In *Sheldon,* the Second Circuit held that union members who opposed amendments to the union constitution were entitled to the opportunity to present their views to the membership. 497 F.2d at 1282. Because the vote was conducted by mail referendum and

 We note that even the first amendment does not contain a requirement that adequate information be provided to ensure that citizens will be enabled to cast enlightened or educated votes in public elections. However, we need not decide here whether we agree with our two sister circuits that meaningful information is necessary when the LMRDA requires that union members be permitted to vote on a particular subject, such as the election of officers.[10] As we have previously explained, "[a]lthough the LMRDA guarantees members the right to vote in union elections, it does not guarantee them the right to vote on" other questions not covered by the statute. *Stelling v. International Bhd. of Elec. Workers*, 587 F.2d 1379, 1385 (9th Cir.1978), *cert. denied sub nom. Darby v. International Bhd. of Elec. Workers*, 442 U.S. 944, 99 S.Ct. 2890, 61 L.Ed.2d 315 (1979). Specifically, the LMRDA does not require that union members be given the opportunity to ratify collective bargaining agreements negotiated by their bargaining representatives. That right is provided, if at all, by the union's constitution or bylaws. *Alexander*, 624 F.2d at 1240; *Confederated Independent Unions v. Rockwell–Standard Co.*, 465 F.2d 1137, 1140 (3d Cir.1972). Even if section 101(a) of the LMRDA is construed as including a full information requirement when membership votes are required by other provisions of the LMRDA, we see no justification for extending that rule to membership votes that, under the LMRDA, need not be conducted at all. It is the union's rules, not the LMRDA, that determine whether a contract ratification vote must be held. Therefore, it is the union's rules, not federal law, to which we must look when determining how the vote must be conducted, including any questions regarding what, if any, information must be afforded to union members during the contract ratification process. In short, it is the breach of the union's internal rules that must serve as the basis for any complaint that insufficient information was provided to the membership prior to or at the time of ratification of a contract. Section 101(a) of the LMRDA affords no remedy for such a breach.

## C

Our decision today does not leave union members without rights in contract ratification cases, nor does it deprive them of a federal remedy for a union's failure to abide by the rules governing the ratification process. If the union's constitution or bylaws affords members the right to ratify a labor-management contract—and almost all do—that right is protected by federal law. However, the federal law that applies is of a different character than the LMRDA.

 Section 301(a) of the LMRA authorizes the federal courts to hear "[s]uits for violation of contracts between an employer and a labor organization ... or between any such labor organizations." 29 U.S.C. § 185(a) (1988). A union constitution is considered a contract between the union and its members, and a member or members may sue the union under section 301(a) for breach of that contract. *Woodell v. International Bhd. of Elec. Workers*, —— U.S. ——, 112 S.Ct. 494, 499, 116 L.Ed.2d 419 (1991); *United Ass'n of Journeymen v. Local 334*, 452 U.S. 615, 619–27, 101 S.Ct. 2546, 2549–53, 69 L.Ed.2d 280 (1981); *Kinney v. International Bhd. of*

---

no meeting was held to discuss the amendments, the court held that the union was required to afford the dissenting members some other means of disseminating their views. *Id.* at 1282–83. There is no specific statutory right to ratify amendments to the union constitution; however, union constitutions, unlike collective bargaining agreements, contain many provisions that are specifically regulated by the LMRDA, including the assessment of dues and the election of officers.

**10.** The *Blanchard* and *Sheldon* courts discussed the right to a "meaningful vote" in the context of section 101(a)(1). We do not understand how the language of this provision, which simply guarantees "equal rights and privileges" to all union members, can be read to include such a right. 29 U.S.C. § 411(a)(1) (1988). If such a right exists, and we do not decide this question here, a more likely source for that right than section 101(a)(1) is the broader guarantees of freedom of expression and participation contained in section 101(a)(2).

*Elec. Workers,* 669 F.2d 1222, 1229 (9th Cir.1981). Unless union members allege a denial or infringement of a specific right provided them in the LMRDA, it is this federal statutory remedy that they must pursue when they contend that rights guaranteed them by their union's constitution or bylaws have been infringed.[11] Here, although the Teamsters constitution provides a right to vote on contract ratification and the nature and extent of that right is subject to union regulation, Ackley and Cole failed to allege any violation of the union's rules and failed to plead any cause of action for such breach.

■ When union members allege a deprivation of rights guaranteed them by the union's constitution or bylaws, they must exhaust whatever internal remedies the union affords prior to bringing suit against the union. *Clayton v. International Union, UAW,* 451 U.S. 679, 688, 101 S.Ct. 2088, 2094–95, 68 L.Ed.2d 538 (1981) (exhaustion requirement applies to "disputes arising over *internal* union matters such as those involving the interpretation and application of a union constitution") (emphasis in original); *Buzzard v. Local Lodge 1040, Int'l Ass'n of Machinists,* 480 F.2d 35, 41 (9th Cir.1973). Most, if not all, international union constitutions specify procedures for appeal to the international from adverse decisions by local union officials. Aggrieved members and unions alike benefit from exhaustion requirements, because such requirements encourage unions to regulate their own conduct. *Bise v. International Bhd. of Elec. Workers,* 618 F.2d 1299, 1303 (9th Cir.1979), *cert. denied,* 449 U.S. 904, 101 S.Ct. 279, 66 L.Ed.2d 136 (1980). When a breach of the union constitution is alleged, an exhaustion requirement allows the international union to issue the authoritative interpretation of that document, as is its prerogative. The union is better equipped than the courts,

for example, to decide whether a constitutional provision for membership ratification of labor-management contracts requires that the membership be given advance notice of the terms of the proposed agreement, or whether a particular method of balloting should be used. The international's president or executive board can issue rulings and thereby establish a body of decisional law. If the internal procedures have been exhausted but a remedy has not been afforded for the alleged wrong, or if the court deems the union's internal procedures inadequate, *Bise,* 618 F.2d at 1303–04, then and only then may the aggrieved union member or members seek a remedy under section 301(a). Even then, courts considering section 301(a) suits will accord great deference to the union's interpretation of its own rules.

Congress's decision to leave the determination of whether and how contract ratification votes must be conducted to the unions reflects an understanding of the complexities of the contract negotiation process. Time is of the essence during contract negotiation and ratification; a few days may mean the difference between an amicable resolution of labor-management differences and a bitter and extended strike. Similarly, when a strike is in progress, if it cannot be ended by a quick ratification vote conducted immediately after a tentative agreement is reached, both sides may suffer serious and even irreparable economic injury—economic injury that both would desperately wish to avoid. Unlike other elections, a contract ratification vote cannot be scheduled in advance, or set for some pre-established date. No one knows until an agreement is reached whether or when negotiators will arrive at a contract. Because there may be an urgent need for speedy ratification, there may not be an opportunity for full argument on each of the provisions of the contract. In addition, ratification procedures

---

**11.** As we have explained in Part IV, in some cases union members may also sue the union under section 301(a) of the LMRA, 29 U.S.C. § 185(a) (1988), for a breach of the duty of fair representation. *See Acri v. International Ass'n of Machinists,* 595 F.Supp. 326, 333–34 (N.D.Cal. 1983) (denying motion to amend pleadings to

add a cause of action under section 101(a)(1) of the LMRDA), *aff'd,* 781 F.2d 1393 (9th Cir.), *cert. denied,* 479 U.S. 816, 107 S.Ct. 73, 93 L.Ed.2d 29 (1986). Ackley and Cole stated a claim for breach of that duty, but failed to establish a right to relief.

must be tailored to the unique characteristics and needs of each union. Some unions span large geographic areas, while others are purely local in nature. The members of some unions work at fixed locations; in other unions, members spend a considerable amount of their working time on the road or in the air. As a result of these and other differences, some groups of union members may prefer that the union hold ratification meetings, while others may opt for a mail balloting procedure. Neither of these procedures is ideal. Mail balloting may impede full debate on important issues, while an open meeting procedure may preclude the type of review of the entire contract that might otherwise be desirable. The individual unions are better suited than the courts to the task of determining what is best for their members—when and under what circumstances ratification votes are appropriate and what procedures are best suited to their members' needs and work schedules.

We do not mean the foregoing discussion to suggest in any way that union democracy is unimportant or that federal labor law accords unions virtually unlimited power to define internal policies and procedures by fiat. Rather, we believe that it demonstrates just the opposite. The legislative scheme established by Congress comprises three distinct, yet complementary, mechanisms designed to ensure the protection of the rights of union members and the democratic self-governance of unions by those members. The LMRDA establishes certain absolute principles to which all unions must adhere and affords certain fundamental rights to all union members; the LMRA provides union members with a means of holding their own union to the promises it has made and the procedures that it has created; and the LMRA also affords union members a right to sue their union for breach of its duty of fair representation. With respect to Congress's decision to leave the task of defining internal union procedures to unions in the first instance, that arrangement does not inhibit union democracy, but rather fosters it. " 'Democratic processes atrophy when they are not exercised; union members will have no in-

terest in improving their organizations' internal adjustment procedures if they never are required to use them.' " *Wiglesworth v. Teamsters Local Union No. 592*, 552 F.2d 1027, 1031 (4th Cir.1976) (quoting Aaron, *The Labor–Management Reporting and Disclosure Act of 1959*, 73 Harv. L.Rev. 851, 869 (1960)), *cert. denied*, 431 U.S. 955, 97 S.Ct. 2676, 53 L.Ed.2d 271 (1977). Although union members must pursue their grievances through established channels, it is the union members who wield the ultimate power to shape union policies and procedures to their liking, through their statutorily guaranteed rights to elect union officials and to certify collective bargaining representatives.

In summary, federal labor law provides a comprehensive remedial framework to address violations of rights guaranteed to union members by statute or by the union constitution or bylaws. Different procedures may be applicable depending on whether it is the former or the latter that is the source of the right at issue. Section 101(a) is only one part of the statutory framework. Congress did not intend that the section address every conceivable violation of union members' rights or authorize the federal courts to determine in every case what procedures best ensure union democracy. We will not read the provision in a manner that Congress clearly did not intend. Because Ackley and Cole do not allege any breach of the union's internal rules, we do not decide whether they have established such a breach and, if so, whether they are entitled to relief under section 301(a).

## VI

■ Although appellants' substantive claims are meritless, we find no basis in law for the district court's award of attorneys' fees to WCT and Local Union 692. Appellees contend that the award is firmly founded in the common benefit theory, which permits fee-shifting in cases where the litigation "confers 'a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible

an award that will operate to spread the costs proportionately among them.'" *Hall v. Cole,* 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973) (extending the common benefit theory to cases brought under the LMRDA) (quoting *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 393-94, 90 S.Ct. 616, 626, 24 L.Ed.2d 593 (1970)). We strongly disagree. The rationale for a "common benefit" award is entirely inapplicable to cases in which a union defendant prevails against a member's or members' claim for relief under the LMRDA.

The common benefit theory permits successful individuals who have benefited fellow members of a class to compel those members to share the costs of obtaining the benefits they have received. In the ordinary common benefit case involving a union, reimbursement from the union treasury serves to shift the cost of litigation from the individual litigating member to the union's dues-paying membership as a whole. *Id.,* 412 U.S. at 8-9, 93 S.Ct. at 1948. The same is true with respect to other unsuccessful group defendants (or conceivably in some circumstances unsuccessful group plaintiffs). No fee-shifting is necessary, however, when a union successfully defends against a member's claim for relief under the LMRDA, because the dues-paying union members, who are the beneficiaries of the litigation, are already bearing the cost. Were plaintiffs to be assessed attorneys' fees, the costs would be shifted *away* from the common beneficiaries. Equally important, in our view, is the fact that the mere prospect of such an award would "chill union members in the exercise of their statutory right to sue the union." *Pawlak v. Greenawalt,* 628 F.2d 826, 831 (3d Cir.1980), *cert. denied,* 449 U.S. 1083, 101 S.Ct. 869, 66 L.Ed.2d 808 (1981). Congress' central purpose in enacting the LMRDA was to secure certain fundamental rights to union members and provide them with a remedy against their infringement. *United Steelworkers v. Sadlowski,* 457 U.S. 102, 109-11, 102 S.Ct. 2339, 2344-45, 72 L.Ed.2d 707 (1982). Extending the common benefit theory in the manner suggested by appellees would be contrary to this objective.

Nor can the district court's award of attorneys' fees to WCT and Local Union 692 be justified on any other ground. In general, determination of the circumstances in which attorneys' fees may be awarded is the exclusive prerogative of Congress. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 260-63, 95 S.Ct. 1612, 1623-24, 44 L.Ed.2d 141 (1975). A federal court may, however, award attorneys' fees not only when the common benefit exception applies but also when the case falls within one of the other two longstanding, judicially created exceptions to the general rule against fee-shifting: willful disobedience of a court order and bad faith or abusive litigation. *Id.* at 258-59, 95 S.Ct. at 1622. In the case before us, there is no allegation that Ackley and Cole willfully disobeyed a court order or acted in bad faith. "[T]he federal courts cannot, absent specific statutory authority or one of the three enumerated exceptions listed by the Supreme Court, alter the uniform system of cost-bearing created by Congress, or shift attorneys' fees merely because a party has lost a case or offended some legal norm." *Zambrano v. City of Tustin,* 885 F.2d 1473, 1481 (9th Cir.1989) (footnote and citation omitted). The union defendants' request for attorneys' fees was not within the district court's authority to grant. Accordingly, the judgment of the district court is

AFFIRMED IN PART AND REVERSED IN PART.